1  ANDRÉ BIROTTE JR.
   United States Attorney
2  DENNISE D. WILLETT
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   JEANNIE M. JOSEPH (Cal. Bar No. 180399)
4  Deputy Chief, Santa Ana Branch Office
   JOSHUA M. ROBBINS (Cal. State Bar No. 270553)
5  Assistant United States Attorneys
        8000 United States Courthouse
6       411 West Fourth Street
        Santa Ana, California 92701
7       Telephone:  (714) 338-3576/3538
        Facsimile:  (714) 338-3708
8       Email: Joshua.Robbins@usdoj.gov
9

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                   SOUTHERN DIVISION

15 UNITED STATES OF AMERICA,          No. SA CR 14-  SACR14-00034

16           Plaintiff,               PLEA AGREEMENT FOR DEFENDANT
                                      MICHAEL D. DROBOT
17           v.

18 MICHAEL D. DROBOT,

19           Defendant.

20

21      1.   This constitutes the plea agreement between MICHAEL D.

22 DROBOT ("defendant") and the United States Attorney's Office for the

23 Central District of California ("the USAO") in the above-captioned

24 case.  This agreement is limited to the USAO and cannot bind any

25 other federal, state, local, or foreign prosecuting, enforcement,

26 administrative, or regulatory authorities.

27 / / /

28 / / /

                            1

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

    a)   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a two-count criminal Information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy in violation of 18 U.S.C. § 371, and Payment of Kickbacks in Connection with a Federal Health Care Program in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).

    b)   Not contest facts agreed to in this agreement.

    c)   Abide by all agreements regarding sentencing contained in this agreement.

    d)   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

    e)   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

    f)   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

    g)   Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.   Defendant further agrees:

a)   Truthfully to disclose to law enforcement officials, at a date and time to be set by the USAO, the location of, defendant's ownership interest in, and all other information known to defendant about, all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, defendant's illegal activities, and to forfeit all right, title, and interest in and to such items.

b)   To the Court's entry of an order of forfeiture at or before sentencing with respect to these assets and to the forfeiture of the assets.

c)   To take whatever steps are necessary to pass to the United States clear title to the assets described above, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

d)   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced by the United States of America against these properties.

e)   Not to assist any other individual in any effort falsely to contest the forfeiture of the assets described above.

f)   Not to claim that reasonable cause to seize the assets was lacking.

g)   To prevent the transfer, sale, destruction, or loss of any and all assets described above to the extent defendant has the ability to do so.

h)   To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the USAO.

1      4.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, the United States Postal Service – Office of Inspector General, the Internal Revenue Service, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.  This cooperation requires defendant to:

      a)   Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

      b)   Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

      c)   Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

      5.   For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement; and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

<u>THE USAO'S OBLIGATIONS</u>

      6.   The USAO agrees to:

      a)   Not contest facts agreed to in this agreement.

      b)   Abide by all agreements regarding sentencing contained in this agreement.

c)     At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d)     Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 35 and provided that the Court does not depart downward in criminal history category.  For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A , without regard to reductions in the term of imprisonment that may be permissible through the substitution of community confinement or home detention as a result of the offense level falling within Zone B or Zone C of the Sentencing Table.

e)     Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 21 below.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the

1  propriety and extent of any departure from that range, and the

2  sentence to be imposed after consideration of the Sentencing

3  Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

4      7.   The USAO further agrees:

5           a)   Not to offer as evidence in its case-in-chief in the

6  above-captioned case or any other criminal prosecution that may be

7  brought against defendant by the USAO, or in connection with any

8  sentencing proceeding in any criminal case that may be brought

9  against defendant by the USAO, any Cooperation Information.

10 Defendant agrees, however, that the USAO may use both Cooperation

11 Information and Plea Information:  (1) to obtain and pursue leads to

12 other evidence, which evidence may be used for any purpose,

13 including any criminal prosecution of defendant; (2) to cross-

14 examine defendant should defendant testify, or to rebut any evidence

15 offered, or argument or representation made, by defendant,

16 defendant's counsel, or a witness called by defendant in any trial,

17 sentencing hearing, or other court proceeding; and (3) in any

18 criminal prosecution of defendant for false statement, obstruction

19 of justice, or perjury.

20          b)   Not to use Cooperation Information against defendant

21 at sentencing for the purpose of determining the applicable

22 guideline range, including the appropriateness of an upward

23 departure, or the sentence to be imposed, and to recommend to the

24 Court that Cooperation Information not be used in determining the

25 applicable guideline range or the sentence to be imposed.  Defendant

26 understands, however, that Cooperation Information will be disclosed

27 to the probation office and the Court, and that the Court may use

28

Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c)   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d)   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 through 4 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1, to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

8.   Defendant understands the following:

a)   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b)   Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c)   Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

1        d)    At this time the USAO makes no agreement or

2 representation as to whether any cooperation that defendant has

3 provided or intends to provide constitutes or will constitute

4 substantial assistance.  The decision whether defendant has provided

5 substantial assistance will rest solely within the exclusive

6 judgment of the USAO.

7        e)    The USAO's determination whether defendant has

8 provided substantial assistance will not depend in any way on

9 whether the government prevails at any trial or court hearing in

10 which defendant testifies or in which the government otherwise

11 presents information resulting from defendant's cooperation.

12 NATURE OF THE OFFENSE

13    9.    Defendant understands that for defendant to be guilty of

14 the crime charged in count one of the Information, that is,

15 Conspiracy, in violation of Title 18, United States Code, Section

16 371, the following must be true:  (1) Beginning in or around 1998

17 and continuing through in or around November 2013, there was an

18 agreement between two or more persons to commit a violation of Title

19 18, United States Code, Sections 1341 and 1346 (Mail Fraud and

20 Honest Services Mail Fraud); Title 18, United States Code, Section

21 1952(a)(3) (Interstate Travel in Aid of a Racketeering Enterprise);

22 Title 18, United States Code, Section 1957 (Monetary Transactions in

23 Property Derived from Specified Unlawful Activity); and Title 42,

24 United States Code, Section 1320a-7b(b)(2)(A) (Payment or Receipt of

25 Kickbacks in Connection with a Federal Health Care Program); (2)

26 defendant became a member of the conspiracy knowing of at least one

27 of its objects and intending to help accomplish it; and (3) one of

28

the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

10.   Defendant understands that Mail Fraud, in violation of Title 18, United States Code, Section 1341, has the following elements:   (1) the defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) the statements made or facts omitted as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.   Defendant further understands that Honest Services Mail Fraud, in violation of Title 18, United States Code, Section 1346, has the following elements:   (1) the defendant devised or participated in a scheme or plan to deprive a patient of his or her right to honest services; (2) the scheme or plan consisted of a bribe or kickback in exchange for medical services; (3) a medical professional person owed a fiduciary duty to the patient; (4) the defendant acted with the intent to defraud by depriving the patient of his or her right of honest services; (5) the defendant's act was material, that is, it had a natural tendency to influence, or was capable of influencing, a person's acts; and (6) the defendant used, or caused someone to use, the mails to carry out or attempt to carry out the scheme or plan.

11.   Defendant understands that Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States

1  Code, Section 1952(a)(3), has the following elements:  (1) defendant
2  used the mail or a facility of interstate commerce with the intent
3  to promote, manage, establish, or carry on, or facilitate the
4  promotion, management, establishment, or carrying on, of unlawful
5  activity, specifically payment and receipt of kickbacks in violation
6  of California Business & Professions Code § 650, California
7  Insurance Code § 750, and California Labor Code § 3215; and (2)
8  after doing so, defendant performed or attempted to perform an act
9  to promote, manage, establish, or carry on, or facilitate the
10  promotion, management, establishment, or carrying on, of such
11  unlawful activity.

12      12.  Defendant understands that Money Laundering, in violation
13  of Title 18, United States Code, Section 1957, has the following
14  elements:  (1) the defendant knowingly engaged or attempted to
15  engage in a monetary transaction; (2) the defendant knew the
16  transaction involved criminally derived property; (3) the property
17  had a value greater than $10,000; (4) the property was, in fact,
18  derived from mail fraud; and (5) the transaction occurred in the
19  United States.

20      13.  Defendant further understands that for defendant to be
21  guilty of the crime charged in count two of the information, that
22  is, Payment of Kickbacks in Connection with a Federal Health Care
23  Program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), the
24  following must be true:  (1) defendant knowingly and wilfully paid
25  remuneration, directly or indirectly, in cash or in kind, to another
26  person; (2) the remuneration was given to induce that person to
27  refer an individual for the furnishing or arranging for the
28  furnishing of any item or service for which payment may be made in

1    whole or in part under a Federal health care program; and (3)

2    defendant knew that such payment of remuneration was illegal.

3                        PENALTIES AND RESTITUTION

4        14.   Defendant understands that the statutory maximum sentence

5    that the Court can impose for a violation of Title 18, United States

6    Code, Section 371, is:  5 years imprisonment; a 3-year period of

7    supervised release; a fine of $250,000 or twice the gross gain or

8    gross loss resulting from the offense, whichever is greatest; and a

9    mandatory special assessment of $100.

10       15.   Defendant understands that the statutory maximum sentence

11   that the Court can impose for a violation of Title 42, United States

12   Code, Section 1320a-7b(b)(2)(A), is:  5 years imprisonment; a 3-year

13   period of supervised release; a fine of $250,000 or twice the gross

14   gain or gross loss resulting from the offense, whichever is

15   greatest; and a mandatory special assessment of $100.

16       16.   Defendant therefore understands that the total maximum

17   sentence for all offenses to which defendant is pleading guilty is:

18   10 years imprisonment; a three-year period of supervised release; a

19   fine of $500,000 or twice the gross gain or gross loss resulting

20   from the offense, whichever is greatest; and a mandatory special

21   assessment of $200.

22       17.   Defendant understands that supervised release is a period

23   of time following imprisonment during which defendant will be

24   subject to various restrictions and requirements.  Defendant

25   understands that if defendant violates one or more of the conditions

26   of any supervised release imposed, defendant may be returned to

27   prison for all or part of the term of supervised release authorized

28   by statute for the offenses that resulted in the term of supervised

release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

18.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty pleas, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

19.  Defendant understands that, if defendant is not a United States citizen, the felony convictions in this case may subject defendant to:  removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty pleas.

20.  Defendant understands that defendant will be required to pay full restitution to the victims of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for

1  the USAO's compliance with its obligations under this agreement, the

2  Court may order restitution to persons other than the victims of the

3  offenses to which defendant is pleading guilty and in amounts

4  greater than those alleged in the counts to which defendant is

5  pleading guilty.  In particular, defendant agrees that the Court may

6  order restitution to any victim of any of the following for any

7  losses suffered by that victim as a result:  (a) any relevant

8  conduct, as defined in U.S.S.G. § 1B1.3, in connection with the

9  offenses to which defendant is pleading guilty; and (b) any charges

10  not prosecuted pursuant to this agreement as well as all relevant

11  conduct, as defined in U.S.S.G. § 1B1.3, in connection with those

12  counts and charges.  The parties have not come to an agreement on

13  the amount of restitution.

14  FACTUAL BASIS

15      21.  Defendant admits that defendant is, in fact, guilty of the

16  offenses to which defendant is agreeing to plead guilty.  Defendant

17  and the USAO agree to the statement of facts provided below and

18  agree that this statement of facts is sufficient to support pleas of

19  guilty to the charges described in this agreement and to establish

20  the Sentencing Guidelines factors set forth in paragraph 23 below

21  but is not meant to be a complete recitation of all facts relevant

22  to the underlying criminal conduct or all facts known to either

23  party that relate to that conduct.

24      Pacific Hospital of Long Beach ("Pacific Hospital") was a

25  hospital located in Long Beach, California, specializing in

26  surgeries, particularly spinal and orthopedic surgeries.  From at

27  least in or around 1997 to October 2013, Pacific Hospital was owned

28  and/or operated by defendant.

1    Beginning in or around 1998 and continuing through in or around
2  November 2013, defendant conspired with dozens of doctors,
3  chiropractors, marketers, and others to pay kickbacks in return for
4  those persons to refer thousands of patients to Pacific Hospital for
5  spinal surgeries and other medical services paid for primarily
6  through the Federal Employees' Compensation Act ("FECA") and the
7  California Workers' Compensation System ("CWCS").  To help generate
8  the monies for the kickback payments, defendant used a co-schemers
9  company or his own company International Implants ("I2"), located in
10 Newport Beach, California, to fraudulently inflate the price of
11 medical hardware purchased by Pacific Hospital to be used in the
12 spinal surgeries; defendant knew that, under California law, medical
13 hardware was considered a "pass-through" cost that could be billed
14 at no more than $250 over what Pacific Hospital paid for the
15 hardware.  In paying the kickbacks, inflating the medical hardware
16 costs, and submitting the resulting claims for spinal surgeries and
17 medical services, defendant and his co-conspirators acted with the
18 intent to defraud workers' compensation insurance carriers and to
19 deprive the patients of their right of honest services.

20    Defendant also provided a stream of financial benefits to
21 California State Senator Ronald S. Calderon ("Senator Calderon") in
22 order to influence him to support, and in exchange for supporting,
23 defendant's positions on legislation and regulations that would
24 enhance defendant's ability to commit and expand his health care
25 fraud scheme -- in particular, legislation concerning hospitals'
26 ability to "pass through" to workers' compensation insurance
27 carriers the cost of medical hardware used in spinal surgeries.

28

The hospital kickback scheme operated as follows:  defendant and other co-conspirators offered to pay kickbacks to doctors, chiropractors, marketers, and others (the "kickback recipients") in return for their referring workers' compensation patients to Pacific Hospital for spinal surgeries, other types of surgeries, magnetic resonance imaging, toxicology, durable medical equipment, and other services, to be paid through FECA and the CWCS.  For spinal surgeries, typically, defendant offered to pay a kickback of $15,000 per lumbar fusion surgery and $10,000 per cervical fusion surgery provided that the surgeon used in the surgery hardware supplied by a specified distributor.  Beginning in approximately 2008, defendant's company I2 typically was the specified distributor; if the surgeon did not use I2's hardware in the surgery, the kickbacks offered were smaller.

Influenced by the promise of kickbacks, the kickback recipients referred patients insured through the CWCS and the FECA to Pacific Hospital for spinal surgeries, other types of surgeries, and other medical services.  In some cases, the patients lived dozens or hundreds of miles from Pacific Hospital, and closer to other qualified medical facilities.  The workers' compensation patients were not informed that the medical professionals had been offered kickbacks to induce them to refer the surgeries to Pacific Hospital.

Pursuant to the kickback agreements, the kickback recipients referred patients to Pacific Hospital.  In the case of spinal surgeries, as part of the kickback agreements, surgeons often used the specified distributor, including I2.  Typically, for surgeries covered by the CWCS, the price I2 or the co-conspirator distributor charged for the hardware was inflated by a multiple of the price at

which I2 or the other distributor had purchased the device from the manufacturer.

Pacific Hospital submitted claims, by mail and electronically, to workers' compensation insurance carriers for payment of the costs of the surgeries and other medical services.  For a spinal surgery, Pacific Hospital typically submitted a claim for the hospital's services and the medical hardware used in the surgery.  For surgeries covered by the CWCS, Pacific Hospital submitted the inflated invoice for the hardware from I2 or other specified distributors who were co-conspirators, plus an additional $250. Thus, the purported "pass-through" cost submitted in the claims for medical hardware was thousands of dollars -- and sometimes tens of thousands of dollars -- higher than what the manufacturer actually charged and what I2 or the co-conspirator distributor actually paid for the hardware.

As defendant and his co-conspirators knew, federal and California law prohibited paying or receiving the aforementioned kickbacks for the referral of patients for medical services. Defendant and his co-conspirators also knew that the insurance carriers would be unwilling to pay claims for medical services that were obtained through such illegal kickbacks.  Moreover, defendant and his co-conspirators knew that the insurance carriers would be unwilling to pay claims for spinal surgery hardware that were artificially inflated and substantially above the manufacturer's price.  However, defendant and his co-conspirators deliberately did not disclose to the insurance carriers the kickbacks, the inflation of the medical hardware, or the fact that I2 was owned and controlled by defendant and was not a manufacturer of such hardware.

1  Rather, at some point, defendant and his co-conspirators included on
2  I2's invoices stamps falsely stating that I2 was an "FDA Registered
3  Manufacturer."

4      Further, to conceal the illegal kickback payments from the
5  workers' compensation insurance carriers and patients, defendant and
6  his co-conspirators entered into bogus contracts under which the
7  kickback recipients purported to provide services to defendant's
8  companies to justify the kickback payments.  The services and other
9  items of value discussed in those contracts were, in fact, generally
10  not provided to Pacific Hospital or were provided at highly inflated
11  prices.  The compensation to the kickback recipients was actually
12  based on the number and type of surgeries they referred to the
13  hospital.  These contracts included, among others, the following:
14  collection agreements, option agreements, research and development
15  agreements, lease and rental agreements, consulting agreements,
16  marketing agreements, and management agreements.

17      Defendant and his co-conspirators kept records of the number of
18  surgeries and other medical services performed at Pacific Hospital
19  due to referrals from the kickback recipients, as well as amounts
20  paid to the kickback recipients for those referrals.  Periodically,
21  defendant and others amended the bogus contracts with the kickback
22  recipients to increase or decrease the amount of agreed compensation
23  described in the contracts, in order to match the amount of
24  kickbacks paid or promised in return for referrals.

25      From in or around 2008 to in or around April 2013, Pacific
26  Hospital billed workers' compensation insurance carriers
27  approximately $500 million in claims for several thousand spinal
28  surgeries that were the result of the payment of kickbacks; and

defendant and other co-conspirators paid kickback recipients between approximately $20 million and $50 million in kickbacks relating to those claims.

To preserve his ability to pass on the inflated spinal surgery hardware costs to the insurance carriers, and thus to help to pay the kickbacks, defendant provided a stream of financial benefits to Senator Calderon in order to induce the senator to oppose legislation and regulation that would have eliminated the "pass-through" rule, as well as to support legislation that would have supported defendant's health care fraud scheme.  For example, at Senator Calderon's request, defendant agreed to pay Senator Calderon's son $10,000 per summer (take-home or net) to work as a summer file clerk for defendant's company in 2010, 2011, and 2012. Defendant would not have ordinarily done this, but did so here in order to ensure that Senator Calderon would take positions on spinal surgery and pass-through legislation favorable to defendant.  In 2010, at Senator Calderon's request, defendant caused his company to pay Senator Calderon's son $10,000 upfront to be a summer file clerk.  In 2011, again at Senator Calderon's request, defendant caused his company to pay Senator Calderon's son $10,000 to be a summer file clerk.  In 2012, defendant made Senator Calderon's son a W-2 employee, which caused taxes to be withheld from his paycheck. When Senator Calderon informed defendant that his son needed to net $10,000 in the summer, defendant caused his company, despite that it was in financial difficulty and laying off workers, to pay Senator Calderon's son an increased amount of up to near $18,000 so that Senator Calderon's son would net $10,000 for the summer of 2012. Defendant ensured that his company made these payments to Senator

Calderon's son each summer regardless of how few days Senator Calderon's son actually worked.

In addition, on several occasions and while Senator Calderon was supporting legislative positions favorable to defendant, defendant took Senator Calderon to exclusive, high-end golf resorts. Defendant paid for these golf outings in order to ensure Senator Calderon's continued legislative support.  Additionally, defendant took Senator Calderon out to expensive dinners and provided him with free flights on a private plane.  All of these financial benefits were intended to ensure that Senator Calderon would take legislative positions favorable to defendant and Pacific Hospital, which would allow defendant to continue to commit and expand his health care fraud scheme.  In response to these financial benefits from defendant, Senator Calderon, among other things, arranged meetings for defendant with other senators to discuss defendant's legislative agenda and advocated positions on legislation that would financially benefit defendant and Pacific Hospital.

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and other co-conspirators committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1

On or about November 10, 2009, defendant caused a check in the amount of $43,650.00 from SCIF to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient J.M. performed by doctor C.D., which claim was induced by the payment of a kickback to J.C.

/ / /

Overt Act No. 2

In or around February 2010, defendant met with Senator Calderon in Sacramento, California and agreed to hire Senator Calderon's son each summer for the next several summers and to pay him $10,000 per summer, so that Senator Calderon would have enough money to pay for his son's college tuition.

Overt Act No. 3

On or about April 14, 2010, defendant caused a check in the amount of $90,467.80 from SCIF to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient L.T. performed by doctor M.C., which claim was induced by the payment of a kickback to P.S.

Overt Act No. 4

In or around April 2010, defendant had Senator Calderon meet with a Director at the Division of Workers' Compensation and discuss the negative impact that proposed regulations would have on Pacific Hospital and other hospitals.

Overt Act No. 5

On or about July 13, 2010, defendant caused Senator Calderon's son to be paid $10,000 in advance of clerical work Senator Calderon's son was to perform at one of defendant's companies.

Overt Act No. 6

In or around February 2011, defendant had Senator Calderon meet with Senator A and request that Senator A introduce legislation in the California Senate that would be favorable to defendant.

Overt Act No. 7

On or about March 31, 2011, defendant caused a check in the amount of $23,531.23 from Vanliner to be sent by mail to Pacific

Hospital in reimbursement for a claim for spine surgery on patient R.S. performed by doctor S.O., which claim was induced by the payment of a kickback to S.O.

Overt Act No. 8

On or about July 11, 2011, defendant caused Senator Calderon's son to be paid $5,000 for clerical work Senator Calderon's son had performed at one of defendant's companies.

Overt Act No. 9

On or about August 16, 2011, defendant caused Senator Calderon's son to be paid $5,000 for clerical work Senator Calderon's son had performed at one of defendant's companies.

Overt Act No. 10

On or about June 12, 2012, defendant had Senator Calderon arrange and participate in a meeting with Senator B, where Senator Calderon and defendant discussed the negative impact Senator B's proposed legislation would have on Pacific Hospital and other hospitals.

Overt Act No. 11

On or about June 29, 2012, defendant caused a kickback in the amount of $100,000 to be paid to S.O. for the referral of lumbar and cervical spinal surgeries performed at Pacific Hospital, including on patients covered by the FECA.

Overt Act No. 12

On or about August 1, 2012, defendant authorized Senator Calderon's son to a gross salary of $18,510.90 for clerical work Senator Calderon's son was performing at one of defendant's companies in order to guarantee that Senator Calderon's son's take-

home (or net) salary totaled approximately $10,000 for the summer of 2012.

Overt Act No. 13

On or about January 18, 2013, defendant caused a check in the amount of $51,115.44 from Traveler's Insurance to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient F.C. performed by doctor T.R., which claim was induced by the payment of a kickback to T.R.

Overt Act No. 14

On or about January 24, 2013, defendant caused a check in the amount of $117,142.36 from Vanliner to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient S.F. performed by doctor G.A., which claim was induced by the payment of a kickback to G.A.

Overt Act No. 15

On or about April 24, 2013, defendant caused a check in the amount of $24,209.90 from ICW to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient F.A. performed by doctor L.T., which claim was induced by the payment of a kickback to L.T.

Overt Act No. 16

On or about November 27, 2013, defendant caused a check in the amount of $50,903.76 from Traveler's Insurance to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient T.V. performed by doctor L.T., which claim resulted from the payment of a kickback to A.I.

SENTENCING FACTORS

22.    Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

23.    Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss between $20M to $50M: | +22 | [U.S.S.G. § 2B1.1(b)(1)(L)] |
| More than 50 victims: | +4 | [U.S.S.G. § 2B1.1(b)(2)(B)] |
| Federal health care offense with gov't program loss of between $1M-$7M: | +2 | [U.S.S.G. § 2B1.1(b)(7)] |
| Adjustments | | |
| Aggravating Role: | +4 | [U.S.S.G. § 3B1.1(a)] |
| Acceptance of Responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| Total: | 35 | |

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 6(c) are met. Subject to paragraph 7 above and paragraph 35 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed.  Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section.

24.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

25.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

26.  Defendant understands that by pleading guilty, defendant gives up the following rights:

      a)  The right to persist in a plea of not guilty.

      b)  The right to a speedy and public trial by jury.

      c)  The right to be represented by counsel – and if necessary have the court appoint counsel - at trial.  Defendant

understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the court appoint counsel – at every other stage of the proceeding.

d)    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e)    The right to confront and cross-examine witnesses against defendant.

f)    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g)    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h)    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

27.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

28.   Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than the low end of the Guidelines range corresponding to a total offense level of 35 and defendant's criminal history category, defendant

gives up the right to appeal all of the following:  (a) the
procedures and calculations used to determine and impose any portion
of the sentence; (b) the term of imprisonment imposed by the Court,
provided it is within the statutory maximum; (c) the fine imposed by
the court, provided it is within the statutory maximum; (d) the
amount and terms of any restitution order, provided it requires
payment of no more than $20,000,000; (e) the term of probation or
supervised release imposed by the Court, provided it is within the
statutory maximum; and (f) any of the following conditions of
probation or supervised release imposed by the Court: the conditions
set forth in General Orders 318, 01-05, and/or 05-02 of this Court;
the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and
3583(d); and the alcohol and drug use conditions authorized by 18
U.S.C. § 3563(b)(7).

29.  The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment of no less than the low
end of the Guidelines range corresponding to a total offense level
of 35 and defendant's criminal history category, the USAO gives up
its right to appeal any portion of the sentence, with the exception
that the USAO reserves the right to appeal the following: the amount
of restitution ordered, if that amount is less than $50,000,000.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

30.  Defendant agrees that if, after entering guilty pleas
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty pleas on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its

obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

31.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

32.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the

27

1  USAO may declare this agreement breached.  For example, if defendant
2  knowingly, in an interview, before a grand jury, or at trial,
3  falsely accuses another person of criminal conduct or falsely
4  minimizes defendant's own role, or the role of another, in criminal
5  conduct, defendant will have breached this agreement.  All of
6  defendant's obligations are material, a single breach of this
7  agreement is sufficient for the USAO to declare a breach, and
8  defendant shall not be deemed to have cured a breach without the
9  express agreement of the USAO in writing.  If the USAO declares this
10 agreement breached, and the Court finds such a breach to have
11 occurred, then:

12         a)   If defendant has previously entered guilty pleas
13 pursuant to this agreement, defendant will not be able to withdraw
14 the guilty pleas.

15         b)   The USAO will be relieved of all its obligations
16 under this agreement; in particular, the USAO: (i) will no longer be
17 bound by any agreements concerning sentencing and will be free to
18 seek any sentence up to the statutory maximum for the crime to which
19 defendant has pleaded guilty; (ii) will no longer be bound by any
20 agreements regarding criminal prosecution, and will be free to
21 criminally prosecute defendant for any crime, including charges that
22 the USAO would otherwise have been obligated not to criminally
23 prosecute pursuant to this agreement; and (iii) will no longer be
24 bound by any agreement regarding the use of Cooperation Information
25 and will be free to use any Cooperation Information in any way in
26 any investigation, criminal prosecution, or civil, administrative,
27 or regulatory action by the United States.

28

c)   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d)   In any investigation, criminal prosecution, or civil, administrative, or regulatory action by the United States: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

33.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was not filed as a result of this agreement, then:

a)   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b)   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to

the extent that such defenses existed as of the date of defendant's
signing this agreement.

## COURT AND PROBATION OFFICE NOT PARTIES

34.   Defendant understands that the Court and the United States
Probation Office are not parties to this agreement and need not
accept any of the USAO's sentencing recommendations or the parties'
agreements to facts or sentencing factors.

35.   Defendant understands that both defendant and the USAO are
free to: (a) supplement the facts by supplying relevant information
to the United States Probation Office and the Court, (b) correct any
and all factual misstatements relating to the Court's Sentencing
Guidelines calculations and determination of sentence, and (c) argue
on appeal and collateral review that the Court's Sentencing
Guidelines calculations and the sentence it chooses to impose are
not error, although each party agrees to maintain its view that the
calculations in paragraph 23 are consistent with the facts of this
case.  While this paragraph permits both the USAO and defendant to
submit full and complete factual information to the United States
Probation Office and the Court, even if that factual information may
be viewed as inconsistent with the facts agreed to in this
agreement, this paragraph does not affect defendant's and the USAO's
obligations not to contest the facts agreed to in this agreement.

36.   Defendant understands that even if the Court ignores any
sentencing recommendation, finds facts or reaches conclusions
different from those agreed to, and/or imposes any sentence up to
the maximum established by statute, defendant cannot, for that
reason, withdraw defendant's guilty pleas, and defendant will remain
bound to fulfill all defendant's obligations under this agreement.

1  Defendant understands that no one -- not the prosecutor, defendant's

2  attorney, or the Court -- can make a binding prediction or promise

3  regarding the sentence defendant will receive, except that it will

4  be within the statutory maximum.

5                      NO ADDITIONAL AGREEMENTS

6        37.   Defendant understands that, except as set forth herein,

7  there are no promises, understandings, or agreements between the

8  USAO and defendant or defendant's attorney, and that no additional

9  promise, understanding, or agreement may be entered into unless in a

10  writing signed by all parties or on the record in court.

11        PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

12        38.   The parties agree that this agreement will be considered

13  part of the record of defendant's guilty plea hearing as if the

14  entire agreement had been read into the record of the proceeding.

15  AGREED AND ACCEPTED

16  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
17
    ANDRÉ BIROTTE JR.
18  United States Attorney

19

20  _____          2/20/14
    JEANNIE M. JOSEPH                    Date
21  Assistant United States Attorney

22  _____          FEB 20, 2014
    MICHAEL D. DROBOT                    Date
23  Defendant

24  _____          Feb 20, 2014
    JEFFREY N. RUTHERFORD/JANET LEVINE   Date
25  Attorneys for Defendant
    Michael D. Drobot
26  _____          2/21/14
27  TERREE A. BOWERS                     Date
    Attorney for Defendant
28  Michael D. Drobot

                        31

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorneys, and my attorneys have advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorneys in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          FEB 20, 2014
MICHAEL D. DROBOT                         Date
Defendant

32

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am Michael D. Drobot's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____          Feb. 20, 2014
JEFFREY H. RUTHERFORD/JANET LEVINE          Date
Attorneys for Defendant
Michael D. Drobot

33

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am Michael D. Drobot's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.


_____     _____
TERREE A. BOWERS                     Date
Attorney for Defendant
Michael D. Drobot

34

### CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of Orange County, California.  I am over 18 years of age, and I am not a party to the above-entitled action.  My business address is the United States Attorney's Office, Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Suite 8000, Santa Ana, California 92701.

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service was made.  On this date, February 21, 2014, I served a copy of the foregoing documents, described as follows: **PLEA AGREEMENT FOR DEFENDANT MICHAEL D. DROBOT** in the following manner:

☒    by placing a true copy in a sealed envelope, addressed to the person specified below, and placing it for interoffice delivery within the courthouse:

☐    by placing the document in a sealed envelope, bearing the requisite postage thereon, and placing it for mailing via the U.S. Postal Service addressed as follows:

☐    by fax to the person and fax number specified below:

☐    by e-mailing a pdf. version of the document to the e-mail address specified below:

> Jeffrey H. Rutherford/Janet Levine
> Crowell & Moring LLP
> 515 South Flower Street, 40th Floor
> Los Angeles, California  90017
>
> Terree A. Bowers
> Arent Fox
> 555 West Fifth Street, 48th Floor
> Los Angeles, California  90013

I declare under penalty of perjury that the foregoing is true and correct, executed on February 21, 2014, at Santa Ana, California.

GINA HERNANDEZ