SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
JOSEPH T. MCNALLY (Cal. Bar No. 250289)
SCOTT D. TENLEY (Cal. Bar No. 298911)
ASHWIN JANAKIRIAM (Cal. Bar No. 277513)
Assistant United States Attorneys
     United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-3500
     Facsimile: (714) 338-3561
     E-mail:    joseph.mcnally@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 14-034-JLS |
| Plaintiff, | POSITION WITH RESPECT TO PRESENTENCE REPORT AND SENTENCING RECOMMENDATION |
| v. | |
| MICHAEL D. DROBOT, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Joseph T. McNally, hereby files its positon with respect to presentence report and sentencing recommendation.

This sentencing position is based upon the attached memorandum of points and authorities, the exhibits attached hereto, the files and records in this case, the presentence investigation report and

recommendation letter, and such further evidence and argument as the Court may permit.

Dated: December 29, 2017

Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

      /s/
JOSEPH T. MCNALLY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

**Contents**

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  FACTUAL BACKGROUND..............................................1

     A.   The Kickback Scheme........................................1

     B.   The Investigation..........................................3

III. DEFENDANT'S PLEA AGREEMENT......................................4

IV.  THE PRESENTENCE REPORT..........................................5

V.   THE § 3553(a) FACTORS SUPPORT A 120-MONTH SENTENCE..............6

VI.  RESTITUTION AND FORFEITURE.....................................10

     A.   Restitution...............................................10

     B.   Forfeiture................................................11

VII. CONCLUSION.....................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                                                    PAGE

**CASES**

United States v. Bussell
    504 F.3d 956 (9th Cir. 2007.................................11

United States v. Chi
    616 Fed. App'x 950 (11th Cir. 2015).........................10

United States v. Crandall
    525 F.3d 907 (9th Cir. 2008)................................11

United States v. Kuhlman
    711 F.3d 1321 (11th Cir. 2013)...............................9

United States v. Miell
    744 F. Supp. 2d 904 (N.D. Iowa 2010).........................8

United States v. Morgan
    635 Fed. Appx. 423 (10th Cir. 2015).......................8, 10

United States v. Musgrave
    761 F.3d 602 (6th Cir. 2014).................................9

United States v. Nayak
    769 F.3d 978 (7th Cir. 2014).................................6

United States v. O'Connor
    321 F. Supp. 2d 722 (E.D. Va. 2004).........................11

United States v. Peppel
    707 F.3d 627 (6th Cir. 2013).................................9

United States v. Prosperi
    686 F.3d 32 (1st Cir. 2012)..................................9

**STATUTES**

28 U.S.C. § 994(d)...........................................8

**OTHER AUTHORITIES**

U.S.S.G. § 5H1...............................................8

U.S.S.G. § 5H1.5.............................................8

U.S.S.G. § 5H1.6.............................................8

U.S.S.G. §5H1.10.............................................8

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Over a fifteen-year period, defendant Michael D. Drobot ("defendant") orchestrated a vast kickback scheme where he paid physicians, chiropractors, and other medical professionals more than $40 million in kickbacks to steer thousands of surgeries to Pacific Hospital of Long Beach ("Pacific Hospital"). Thousands of patients received surgeries at Pacific Hospital not knowing that defendant bribed their physician to perform their surgery at Pacific Hospital. Defendant was motivated by greed and ultimately profited millions of dollars through the scheme. Based on the Guidelines and the § 3553(a) factors, including in particular the strong public interest in deterring others from engaging in this conduct, the government recommends the Court sentence defendant to a Guidelines term of imprisonment, three years of supervised release, and a fine of $500,000.

**II. FACTUAL BACKGROUND**

**A. The Kickback Scheme**

Located in Long Beach, California, Pacific Hospital specialized in surgeries, particularly spinal and orthopedic surgeries. (CR 7, Plea Agreement at 13.) From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by defendant. (Id. at 14.) Beginning in or around 1998 and continuing through in or around November 2013, defendant conspired with dozens of doctors, chiropractors, marketers, and others to pay kickbacks in return for the referral of thousands of patients to Pacific Hospital for spinal surgeries and other medical services paid for primarily through the Federal Employees' Compensation Act ("FECA") and the California

Workers' Compensation System ("CWCS"). (Id.)

To help generate the monies for the kickback payments, defendant used other entities and his own medical hardware company International Implants ("I2") located in Newport Beach, California. I2 generated the kickback money by doing the following: (1) I2 purchased medical hardware from hardware manufacturers, (2) I2 hardware was used in surgeries at Pacific Hospital, (3) I2 invoiced the hospital for the hardware in amounts higher than what it paid the manufacturer, and (4) the hospital passed the invoiced amount, plus $250, onto the workers compensation entities. (Id.) Because the California "pass through" rule required the workers compensation entities to pay the amount for which the hospital was invoiced for the hardware plus $250, defendant knew that Pacific Hospital would be fully reimbursed by workers compensation entities for the price I2 invoiced the hospital. In fact, defendant bribed a state senator in order to ensure that it remained in place. (Id. 14, 16-18.) Defendant did not disclose the kickbacks or the fact that he controlled I2 to the insurance carriers and that I2 was reselling hardware obtained from third party manufacturers. (Id. at 16.) Through the operation of I2, defendant generated substantial profits that he used to pay at least $40 million dollars in kickbacks. According to the former CFO of Pacific Hospital, his income, bonuses, and other compensation at the hospital was in excess of $20,000,000.

Defendant – whose education and career was in hospital management – knew that the payment of kickbacks was illegal. (PSR ¶¶ 89-95.) To conceal the illegal kickback payments, defendant and his co-conspirators entered into bogus contracts under which the kickback recipients purported to provide services to defendant's companies to

justify the kickback payments. (CR 7 at 18, PSR ¶ 37.) The services and other items of value discussed in those contracts were, in fact, generally not provided or were provided at highly inflated prices. (CR 7 at 17.) The compensation to the kickback recipients was actually based on the number and type of surgeries they referred to the hospital. (Id.) These contracts included, among others: collection agreements, option agreements, research and development agreements, lease and rental agreements, consulting agreements, marketing agreements, and management agreements. (Id.) Periodically, defendant and others amended the bogus contracts with the kickback recipients to increase or decrease the amount of compensation described in the contracts, in order to match the amount of kickbacks paid or promised in return for referrals. (Id.)

The kickbacks were effective. From in or around 2008 to in or around April 2013, Pacific Hospital billed workers' compensation insurance carriers no less than $500 million in claims for several thousand spinal surgeries that were the result of the payment of kickbacks. (Id. at 17-18.) The patients believed that they were receiving conflict-free medical advice when, in fact, defendant illegally incentivized their physician to perform the surgery at Pacific Hospital. (Id. at 15-17.) In some cases, the patients lived dozens or hundreds of miles from Pacific Hospital, and closer to other qualified medical facilities. (Id. 15.) The victim impact statements the government received are filed under seal as Exhibit A.

**B.   The Investigation**

In 2012, defendant was recorded by government cooperators in a series of conversations where he discussed the payment of kickbacks to medical professionals in exchange for their performance of

surgeries at Pacific Hospital. On April 4, 2013 and April 5, 2013, the government executed search warrants at Pacific Hospital, I2, and defendant's offices in Newport Beach. In June, July, and August 2013, a cooperating doctor-defendant to whom defendant paid kickbacks conducted a covert recording wherein defendant discussed the kickback scheme. Around December 2013, the government confronted defendant with the recordings and other evidence. Defendant entered into a cooperation plea agreement with the government on February 20, 2014. (CR 7.)

**III. DEFENDANT'S PLEA AGREEMENT**

As part of his plea agreement, defendant waived indictment and pleaded guilty to conspiracy to commit mail fraud, honest services mail fraud, traveling in aid of a racketeering enterprise, and money laundering, in violation of 18 U.S.C. § 371, and Payment of Kickbacks in Connection with a Federal Health Care Program in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). (Id. at 2.) The agreement capped defendant's statutory maximum sentence at ten years' imprisonment and the government agreed not to file additional charges arising out of the scheme. (Id. at 11.) Defendant agreed to forfeit the proceeds of his criminal conduct. (Id. at 3.) The parties did not agree on any restitution amount and defendant waived his right to appeal the amount of restitution. (Id. at 20.)

Defendant and the government stipulated to the following Guidelines calculations and agreed not to argue for any other enhancements:

```
Base Offense Level:         6    [U.S.S.G. § 2B1.1(a)(2)]
Loss of $20M to $50M:     +22    [U.S.S.G. § 2B1.1(b)(1)(L)]
More than 50 victims:      +4    [U.S.S.G. § 2B1.1(b)(2)(B)]
```

```
Federal health care
offense with gov't
program loss of
between $1M-$7M:          +2   [U.S.S.G. § 2B1.1(b)(7)]

Aggravating Role:         +4   [U.S.S.G. § 3B1.1(a)]

Acceptance of Responsibility: -3   [U.S.S.G. § 3E1.1]
```

## IV. THE PRESENTENCE REPORT

On December 27, 2017, the United States Probation Office ("USPO") disclosed the operative presentence report ("PSR"). (CR 88.) The PSR adopted the calculations in the parties' plea agreement except it applied a two-level rather than four-level adjustment for the number of victims, and it applied an enhancement for sophisticated means. (PSR ¶¶ 50-64.) The PSR found that defendant has no criminal history points. (PSR ¶ 69.) Based on an offense level of 35 and a criminal history category of I, the PSR calculated defendant's Guidelines range as 168-210 months' imprisonment. (PSR ¶ 117.) Because the statutory maximum sentence is less than the Guidelines, the Guideline term becomes the statutory maximum sentence of 120 months' imprisonment. (PSR ¶ 117.) The PSR recommended a fine in the amount of $500,000. (PSR ¶ 114.) The USPO recommended a slight downward variance, to a sentence of 104 months' imprisonment. (Rev. Rec. Letter.)

The government has no objections to the facts in the PSR. The government objects to the application of the sophisticated means enhancement. The parties entered into a stipulation relating to the applicable Guidelines enhancements, and agreed not to seek any other enhancements; the government therefore respectfully requests the Court adopt the calculations in the plea agreement. After defendant entered into the plea agreement, the Guidelines were amended and the

enhancement for victimizing more than 50 entities is two levels rather than four. As the USPO recommends, defendant should be sentenced under the current version of the Guidelines and the Court should apply a two-level, rather than four-level, enhancement. If the Court adopts these changes, the resulting offense level would be 33 and the corresponding Guidelines range would be 135-168 months' imprisonment. The Guideline range remains the statutory maximum sentence of 120 months' imprisonment and the maximum fine is $500,000.

**V. THE § 3553(a) FACTORS SUPPORT A 120-MONTH SENTENCE**

The nature and circumstances of the offense are especially aggravated here and support a 120-month sentence. Defendant did not engage in one-off criminal conduct. For more than a decade, defendant orchestrated a massive kickback scheme where he bribed physicians, chiropractors, and others in order to steer surgeries to Pacific Hospital. Defendant was the leader of the conspiracy and directed employees at Pacific Hospital to help him execute the kickback scheme by creating the bogus contracts that paid out and concealed the kickbacks. Insurance providers who ultimately paid I2 invoices funded the kickbacks. Defendant was motivated by greed and generated substantial profits from his criminal activity.

The harm here – although difficult to quantify – is substantial. First, it is axiomatic that patients have the right to conflict free medical advice. See e.g., United States v. Nayak, 769 F.3d 978, 984 (7th Cir. 2014) ("Indeed, the intangible harm from a fraud can often be quite substantial, especially in the context of the doctor-patient relationship, where patients depend on their doctor — more or less completely — to provide them with honest medical services in their

best interest.")  Through his conduct, defendant deprived thousands of patients – many who were undergoing potentially life altering medical procedures – of their right to conflict-free advice from their physicians about whether to have surgery and, if so, the best hospital for the surgery.  Some of the patients traveled long distances to have surgery at Pacific Hospital – despite having a high quality facility in their area – because defendant was paying the physician a kickback to perform the surgery at Pacific Hospital. Second, these types of kickback schemes make it difficult, if not impossible, for other hospitals, who obey the law and do not pay kickbacks, to compete for surgeries in the open market.  Defendant used his kickback scheme to obtain and control a substantial share of the spine surgery market in Southern California.  Doctors were incentivized to perform surgeries at Pacific Hospital rather than other hospitals where they would not receive a $10,000 or $15,000 kickback.  This conduct - especially by a large player in the regional health care industry - encourages other hospitals to pay kickbacks because they come to understand that paying kickbacks is the only way that they can compete.  Finally, these schemes substantially undermine public confidence and trust in the health care industry.  The public turns to physicians and medical professionals during the most vulnerable period of their lives and the public must have confidence that their medical professionals are acting in their best interest.  Defendant's conduct undermines that confidence.

    Defendant's personal history and characteristics also support the recommended sentence.  Defendant had an advanced degree, successfully worked in hospital administration, and his conduct

orchestrating the scheme here demonstrates that he is exceptionally intelligent.  Defendant had the tools, experience, and intellect to run his hospital legitimately, but he chose crime.  See United States v. Miell, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010) ("A crime of fraud by one who is otherwise successful, apparently by legitimate means, is . . . particularly disturbing."), aff'd, 661 F.3d 995 (8th Cir. 2011).

Defendant will undoubtedly seek a variance based on his fall from the heights of professional status and financial privilege, the closure of his business, the collateral consequences of his imprisonment, and a host of other such outcomes.  However, through the Guidelines, Congress has pointedly addressed and rejected factors both individually and cumulatively in the form of "I've been punished enough" from privileged white collar criminals who bemoan the collateral consequences of a Guideline sentence, while implicitly dooming the less privileged and less fortunate to suffer greater punishments.  28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant); U.S.S.G. §5H1.10 (socioeconomic status of defendant not relevant).

The federal courts have repeatedly agreed.  United States v. Morgan, 635 Fed. Appx. 423 (10th Cir. 2015) (reversing defendant's probationary sentence for bribery and agreeing "with the reasoning of the Sixth, Seventh, and Eleventh Circuits [that b]y considering publicity, loss of law license, and deterioration of physical and

financial health as punishment, the court impermissibly focused on the collateral consequences [and favored criminals] with privileged backgrounds"); United States v. Musgrave, 761 F.3d 602, 608-09 (6th Cir. 2014) ("Impermissible considerations permeated the district court's justification for Musgrave's sentence.  In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life."); United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) (vacating sentence of white collar criminal, stating, "The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status . . . unavailable to defendants of lesser means"); United States v. Peppel, 707 F.3d 627, 636 (6th Cir. 2013) (holding district court inappropriately considered collateral consequences for white collar defendant, noting longstanding precedent that to do so "would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines"); United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white collar offenders suffer greater reputational harm or have more to lose by conviction.").

A Guidelines range sentence in this case will also serve as much needed general deterrence to other high-ranking health care executives and owners contemplating orchestrating a kickback scheme, and consequently promote respect for kickback laws.  See United

States v. Chi, 616 Fed. App'x 950 (11th Cir. 2015) (affirming 120 month sentence where district court emphasized the importance of deterrence in kickback case); Morgan, 635 Fed. App'x at 450 (emphasizing that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes"). Kickback schemes are difficult to detect because health care executives go to great lengths – like those defendant employed here – to cover up the kickbacks. But kickbacks are highly rewarding as hospital executives and owners can generate tens of millions of dollars in profits by boosting their surgery numbers through the payments of kickbacks. The recommended sentence deters this conduct. Conversely, a departure below the recommended sentence under these circumstances will further encourage high-ranking health care executives and owners to engage in kickback schemes, after weighing the low risk of detection and the likelihood of a lenient sentence if they are caught. Id. at 450 ("General deterrence comes from a probability of conviction and significant consequences").

## VI. RESTITUTION AND FORFEITURE

### A. Restitution

The government received claims for restitution and met with victims to discuss the restitution issues here. The restitution requests received are filed as a part of Exhibit A and the government anticipates that other entities may submit claims before the January 12, 2018 sentencing hearing.[1] On December 28, 2017, the parties submitted a stipulation requesting that the Court set a hearing to determine victim losses for restitution purposes of May 18, 2018 or

---

[1] The government will file any additional claims with the Court and serve them on the probation officer forthwith.

at a date thereafter convenient to the Court.  It is the parties' position that additional time will allow the government to receive victim impact statements from any victim who elects to submit such a statement, and determine the appropriate recipients of restitution in this case.  The amount of restitution "is limited to the victim's actual losses."  United States v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007); see also United States v. Crandall, 525 F.3d 907, 916 (9th Cir. 2008). "[A]ctual loss for restitution purposes is determined by comparing what actually happened with what would have happened if the defendant had acted lawfully." Bussell, 504 F.3d at 964 (quotations and brackets omitted); see also Crandall, 525 F.3d at 916 (noting the potential for different outcomes because loss under the Guidelines serves a punitive purpose, while restitution is limited to actual losses); Bussell, 504 F.3d at 964 (observing that a restitution award should account for "actual loss").  This is a kickback case and the amount of actual loss is more complex than an ordinary fraud case.  The restitution claims here are wide-ranging. The government respectfully moves the Court to confirm enter the parties' proposed order, and confirm during the sentencing proceeding that a restitution order will issue in this matter.

**B.   Forfeiture**

Because "forfeiture and restitution serve distinct goals" (with forfeiture designed to punish the offender and remove the fruits and instrumentalities of the crime from the offender and restitution intended to compensate victims), "forfeiture and restitution are not mutually exclusive." United States v. O'Connor, 321 F. Supp. 2d 722, 729 (E.D. Va. 2004).  Defendant's plea agreement provides that he will disclose, forfeit, and consent to the entry of an order of

forfeiture of "all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, defendant's illegal activities, and to forfeit all right, title, and interest in and to such items." Plea Agreement ¶ 3(a), (b) (emphasis added). Defendant has assets they are detailed in the Probation Form 48 that is available for the Court's review. The government has directed defendant to comply with this provision and it expects that he will do so forthwith.[2] Alternatively, the parties are discussing a stipulated resolution related to forfeiture.

## VII. CONCLUSION

For the foregoing reasons, the Court should sentence defendant to 120 months' imprisonment, three years supervise release, and a fine of $500,000.

---

[2] The government declines to make any substantial assistance motion because defendant has not complied with this obligation.